Filed 5/12/15  P. v. Torres CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H040348 |
| Plaintiff and Respondent, | (Monterey County Super. Ct. No. SS120946A&B) |
| v. | |
| RICARDO TORRES et al., | |
| Defendants and Appellants. | |

Defendants Ricardo Torres and Manuel Rivera were each convicted, by jury trial, of assault by means of force likely to produce great bodily injury (Pen. Code, § 245, subd. (a)(4)) following a fight outside a gay bar in Castroville.[1]  The jury also found true the allegations that Torres and Rivera personally inflicted great bodily injury in the commission of the assault (§ 12022.7, subd. (a)) and that the assault was a hate crime (§ 422.75, subd. (a)).  Torres was denied probation and sentenced to an aggregate term of 19 years in prison.  Rivera was sentenced to a total term of eight years in prison, but the court suspended execution of his sentence and placed him on six years' felony probation. Both defendants appealed.

On appeal, Torres claims the trial court committed prejudicial error by instructing the jury pursuant to CALCRIM Nos. 3160 and 370.  Rivera joins in Torres' claims regarding CALCRIM No. 370 and also argues two of his probation conditions are unconstitutionally vague.  We agree with Rivera's contentions regarding the vagueness of

---

[1] Further unspecified statutory references are to the Penal Code.

his probation conditions and modify the judgment. However, we reject the defendants' claims of instructional error and affirm the judgment as modified.

## FACTUAL AND PROCEDURAL BACKGROUND

*Procedural History*

On August 17, 2012, the Monterey County District Attorney's office filed an amended information charging Torres and Rivera each with a count of assault with great bodily injury (§ 245, subd. (a)(1); count 1), a count of battery with serious bodily injury (§ 243, subd. (d); count 2), and a count of a violation of civil rights by force or threat (§ 422.6, subd. (a); count 3). As to count 1, it was alleged as to Torres and Rivera that each personally inflicted great bodily injury (§ 12022.7, subd. (a)) and that the offense was committed as a hate crime due to the victim's sexual orientation (§ 422.75, subd. (a)). As to count 2, it was also alleged as to both defendants that each inflicted great bodily injury (§ 12022.7, subd. (a)) and that the offense was a hate crime (§ 422.75, subd. (a)). As to Torres, it was alleged he had prior serious felony convictions (§ 1170.12, subd. (c)(2)) and had served a prior prison term (§ 667.5, subd. (b)). On August 7, 2013, the People amended the information to add three additional allegations that Torres had suffered a prior serious felony conviction pursuant to section 667, subdivision (a)(1).

On August 12, 2013, Torres waived a jury trial and admitted the allegation pursuant to section 667.5, subdivision (b), two of the allegations pursuant to section 667, subdivision (a)(1), and two of his prior convictions pursuant to section 1170.12, subdivision (c)(2). The district attorney dismissed one of the allegations pursuant to section 667, subdivision (a).

Two days later, the People dismissed counts 2 and 3 as to both Torres and Rivera.

*The Prosecution's Case*

Ernesto Sanchez owned Franco's Norma Jean's Club, a gay bar located in Castroville. Sanchez was working at the bar on May 20, 2012. At approximately 1:45

a.m., he began to close the bar. He turned on the lights and heard a noise that sounded like fighting towards the back of the dance floor. He saw two suspects, who he later identified as Torres and Rivera, "saying bad words" and yelling, using the term "faggot." Sanchez immediately called 911 and walked over. He saw a bar patron, Niko, on the floor. Sanchez did not see Torres or Rivera hit Niko. However, both defendants were standing over him, saying obscenities. Sanchez said he heard the defendants say "faggot" several times. Sanchez managed to get Torres and Rivera out of the club. As he was being escorted out, Torres warned Sanchez that he "better not be calling the cops," otherwise he would "burn down [his] place."

Sanchez returned to the dining room of the bar to call 911 again. At that point, he saw Torres and Rivera hitting and kicking somebody outside the bar. Sanchez saw Torres kick the victim, later identified as Aurelio Alvarado, in the head. He also heard Torres and Rivera repeatedly call Alvarado a "fucking faggot." Torres and Rivera ran off after the police arrived. When they were apprehended, Sanchez identified them from a photo lineup.

Cecilia Guevara was employed as a security officer at the bar that night. She saw Alvarado being beaten outside the bar by the defendants. Guevara said she did not hear Rivera say anything, but she heard Torres say "faggot" as he was hitting Alvarado. She described Rivera as being "on his knees having [Alvarado] by the neck punching him." She saw Rivera hit Alvarado a minimum of three times. At that point, Alvarado was on the floor.

Guevara returned to the bar to tell Sanchez to call the police. Sanchez told Guevara he was already on the phone with the police, so she went back outside. At that point, she saw Torres kick the victim in the head. Guevara asserted that it looked like Alvarado blacked out after the kick. She heard Torres call Alvarado a "faggot."

3

Afterwards, Guevara attempted to help Alvarado sit up. She said Alvarado seemed disoriented. Torres threatened Guevara and several other bystanders.

Veronica Lara was at the bar that night with her partner, Griselda Martinez. Lara and Martinez were leaving the bar when they heard a commotion. They witnessed the assault on Alvarado, and walked toward the attackers to get them to stop. Lara identified Rivera as the individual who was hitting Alvarado. She also saw Torres kick Alvarado in the head. After the kick, Alvarado's eyes went white and he fell on the floor. Lara said Torres threatened several bystanders. Martinez also identified Rivera. Martinez saw Torres kicking Alvarado unconscious. She also heard Torres call Alvarado a "fucking fag" afterwards.

Rene Gonzalez Corona, who was in a relationship with Alvarado, was at the bar with him the night of the attack. Corona and Alvarado left the bar after the last call. They ran into Torres and Rivera outside. Rivera asked Corona and Alvarado, "What's your problem?" Corona thought he looked angry. Rivera asked Corona why he "grabbed his butt at the bar." Corona did not know what Rivera was talking about. Corona moved aside, and Rivera responded, "Well, then, it's not your problem." Rivera then grabbed Alvarado and began beating him. Rivera punched Alvarado in the face multiple times, grabbing him in a choking fashion. Alvarado eventually fell to the ground. Corona then saw Torres kick him in the head once. Corona heard Torres call Alvarado a "faggot."

Monterey County Sheriff's Deputy Jose Sheppy responded to the call from the bar that night. He made contact with Rivera after witnesses identified him in a group walking along the street. Rivera took off his hat and threw it on the ground when Sheppy approached. He told Sheppy he had been assaulted in front of the bar. Witnesses told Sheppy that there was another suspect walking with another group of individuals across the street.

4

Monterey County Sheriff's Deputy Chris Brown also testified. He was also dispatched to the bar the night of the incident. He made contact with Deputy Sheppy, who had already detained Rivera. Sheppy told Brown that there was another suspect, later identified to be Torres, across the street. Brown conducted an infield show-up of Rivera and Torres with Corona. Corona identified both of them.

Monterey County District Attorney's Investigator Roy Diaz testified that he showed the photo lineup to Sanchez. Sanchez identified Torres, and chose two photos that he identified as Rivera. Guevara identified both Torres and Rivera.

Alvarado also testified, explaining that he went to the bar with Corona that night. As they were leaving, they noticed two individuals outside, who he later identified as Torres and Rivera. Alvarado said that because of his limited English skills, he was not completely sure what Torres and Rivera said to him. However, he knew that they were angry about an incident in the bar where someone had touched them inappropriately. Alvarado did not remember anyone saying anything about his sexual orientation. He remembered getting hit by Rivera multiple times. He did not remember how many punches there were and could not recall being kicked. A few days after the incident, Alvarado said he could hear echoes and began experiencing headaches. He went to the hospital due to his worsening symptoms.

*The Defense's Case*

Vickie Rodriguez, an investigator for the public defender's office, testified on behalf of the defense. She interviewed Alvarado about the assault. She said Alvarado told her that he could not identify his assailants, but Corona and Guevara had told him Torres and Rivera were the attackers. Alvarado said he was told that if he did not identify the two attackers, they would be released by the police.

Rodriguez also interviewed Sanchez. She showed Sanchez photographs of Torres and Rivera. Rodriguez asserted that Sanchez did not identify Rivera as the "short attacker" based on a lineup of photographs.

Several of Rivera's friends testified that they had been with Rivera that night for a bachelor party. One friend said he had never seen Rivera act in a homophobic manner and described him as a calm, peaceful person.

The defense recalled Deputy Brown, who interviewed Alvarado that night. Brown said Alvarado told him he could not remember anything after he walked towards Corona that night, since he blacked out. He did not give Brown a description of his attackers.

Rivera testified on his own behalf. He expressed disapproval for hate crimes on homosexual individuals and said he had family members who were gay. He denied attacking Alvarado. He confirmed he went out for a bachelor party the night of the assault. Rivera said he went to Mike's Bar, leaving near closing time. He was attacked outside as he left. After the attack, he saw crowds of people pointing at him. Rivera believed the crowd had assaulted him. He found a bump on his head that had scabbed over the morning after the attack. Rivera identified Torres as an acquaintance.

The defense called Officer Sheppy, who testified that he came into contact with Rivera and Torres after he responded to the call about the attack in front of the bar. Rivera told Sheppy that he had been assaulted. Torres did not look like he had been in a fight; there was no blood on his clothing or any visible injuries on his body.

*The Verdict and Sentencing*

On August 16, 2013, the jury returned a verdict, finding both Torres and Rivera guilty of assault (§ 245, subd. (a)(4)) and finding true the allegations that they personally inflicted great bodily injury in the commission of the assault (§ 12022.7, subd. (a)) and that the assault was committed as a hate crime (§ 422.75, subd. (a)).

6

On November 1, 2013, the court partially granted Torres' *Romero*[2] motion, striking one of his prior strike convictions but declining to strike another. That same day, the trial court denied Torres' probation and sentenced him to an aggregate term of 19 years in prison, comprised of two years for his conviction of assault doubled pursuant to section 667, subdivisions (b) through (i) for a total term of four years, three years for the great bodily injury enhancement pursuant to section 12022.7, subdivision (a), two years for the hate crime enhancement pursuant to section 422.75, and five years each for his prior serious felony convictions pursuant to section 667, subdivision (a)(1). The court imposed but stayed punishment for his enhancements pursuant to section 667.5. Torres was given 314 days of custody credit, comprised of 273 actual days and 41 days custody credit.

The trial court sentenced Rivera to a total term of eight years in prison, but suspended execution of sentence and imposed a term of six years' probation. Both defendants appealed.

### DISCUSSION

Torres claims the trial court committed prejudicial error by instructing the jury pursuant to CALCRIM Nos. 3160, 370, and 1354. Rivera joins in Torres' claims regarding the use of CALCRIM No. 370 and also argues two of his probation conditions are unconstitutionally vague. We address the claims of instructional error first.

1. *Instructional Error*

   a. **Standard of Review**

" 'In considering a claim of instructional error we must first ascertain what the relevant law provides, and then determine what meaning the instruction given conveys.' " (*People v. Lopez* (2011) 199 Cal.App.4th 1297, 1305.) In deciding whether instructional

---

[2] *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497, 530.

error occurred, we "assume that jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given." (*People v. Mills* (1991) 1 Cal.App.4th 898, 918 (*Mills*).) In that context, we must then "determine whether it is reasonably likely the jurors understood the instruction[s] as [defendant] suggests. [Citation.] In making that determination, we must consider several factors including the language of the instruction[s] in question [citation], the record of the trial [citation], and the arguments of counsel." (*People v. Nem* (2003) 114 Cal.App.4th 160, 165.) "[T]he case law is clear that whether the giving of a concrete instruction is confusing or erroneous must be determined from the instructions as a whole . . . 'whether a jury has been correctly instructed is not to be determined from a part of an instruction or one particular instruction, but from the entire charge of the court.' " (*People v. Patterson* (1979) 88 Cal.App.3d 742, 753.)

Errors in jury instructions are typically reviewed under the standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836. (*People v. Breverman* (1998) 19 Cal.4th 142, 172-178.) Therefore, an error requires reversal only where "an examination of the entire record establishes a reasonable probability that the error affected the outcome." (*Id.* at p. 165, citing *People v. Watson*, *supra*, at p. 836 & Cal. Const., art. VI, § 13.)

b. **CALCRIM No. 3160**

Torres claims the trial court committed prejudicial error when it instructed the jury with CALCRIM No. 3160, which instructs the jury on the group beating exception to the enhancement for personally inflicting great bodily injury (§ 12022.7, subd. (a)). He claims there was no evidence to support giving this instruction.

Section 12022.7, subdivision (a), provides in pertinent part: "Any person who personally inflicts great bodily injury on any person . . . in the commission of a felony . . . shall be punished by an additional and consecutive term of imprisonment in the state prison for three years."

8

In *People v. Modiri* (2006) 39 Cal.4th 481 (*Modiri*), the California Supreme Court discussed the group beating exception to the "personally inflicts" requirement found in section 1192.7, subdivision (c)(8).[3] The *Modiri* defendant claimed the standard instruction given at his trial, CALJIC No. 17.20,[4] omitted the requirement under section 1192.7, subdivision (c)(8) that he personally inflicted great bodily injury on the victim. The Supreme Court rejected the defendant's arguments, finding the instruction reasonably conveyed the statutory principles outlined in section 1192.7, subdivision (c)(8). The challenged instruction required jurors to first determine whether defendant was guilty of the charged crime. (*Modiri*, *supra*, at p. 493.) Jurors were instructed that the instruction only applied if the defendant had participated in a group beating and it was not possible to determine which assailant inflicted a particular injury. (*Id.* at pp. 493-494.) The instruction only allowed a jury to "permit a personal-infliction finding . . . if the defendant personally 'appl[ies] unlawful physical force' to the victim." (*Id.* at p. 494.) The physical force applied must have been sufficient to produce great bodily injury either by itself, or in combination with the force applied by the other assailants. (*Ibid.*) "Both group beating theories [under the instruction] exclude persons who merely assist someone else in producing injury, and who do not personally and directly inflict it themselves." (*Ibid.*) Thus, under *Modiri*, a great bodily injury finding is proper in the situation where a defendant "joins [another] in actually beating and harming the victim, and where the precise manner in which he contributes to the victim's injuries cannot be measured or ascertained." (*Id.* at p. 495.)

---

[3] Although *Modiri* involved section 1192.7, subdivision (c)(8), the court's holding applies equally to section 12022.7. (*People v. Dunkerson* (2007) 155 Cal.App.4th 1413, 1417.)

[4] CALJIC No. 17.20 is the predecessor of CALCRIM No. 3160.

Consistent with the law set forth in *Modiri*, the trial court instructed the jury on CALCRIM No. 3160 as follows:

"If you find the defendant guilty of the crime charged in Count 1, you must then decide whether the People have proved the additional allegation that the defendant personally inflicted great bodily injury on Aurelio Alvarado in the commission of that crime.

"You must decide whether the People have proved this allegation and return a separate finding for each defendant.

"Great bodily injury, again, means significant or substantial physical injury. It is an injury that is greater than minor or moderate harm.

"If you conclude that more than one person assaulted Aurelio Alvarado and you cannot decide which person caused which injury, you may conclude that the defendant personally inflicted great bodily injury on Aurelio Alvarado if the People have proved that, one, two or more people acting at the same time assaulted Aurelio Alvarado and inflicted great bodily injury on him.

"Two, the defendant personally used physical force on Aurelio Alvarado during the group assault.

"And 3A, the amount or type of physical force the defendant used on Aurelio Alvarado was enough that it alone could have caused Aurelio Alvarado to suffer great bodily injury.

"Or, 3B, the physical force that the defendant use[d] on Aurelio Alvarado was sufficient in combination with the force used by the others to cause Aurelio Alvarado to suffer great bodily injury.

"The defendant must have applied substantial force to Aurelio Alvarado. If that force could not have caused or contributed to the great bodily injury, then it was not substantial.

10

"The People have the burden of proving each allegation beyond a reasonable doubt. If the People have not met this burden, you must find that the allegation has not been proved."

Preliminarily, the People argue Torres is barred from bringing this claim under the doctrine of invited error, because the trial court instructed the jury with CALCRIM No. 3160 after his trial counsel listed it in his trial brief as a proposed instruction. Additionally, the court indicated that the parties had agreed to give CALCRIM No. 3160 during the conference on jury instructions. No objection was made by Torres' counsel.

"When a defense attorney makes a 'conscious, deliberate tactical choice' to [request or] forego a particular instruction, the invited error doctrine bars an argument on appeal that the instruction was [given or] omitted in error." (*People v. Wader* (1993) 5 Cal.4th 610, 657-658.) However, a defendant's mere failure to object to an instruction is not sufficient to show invited error. (*People v. Moon* (2005) 37 Cal.4th 1, 29, fn. 4.)

Torres acknowledges his trial counsel included CALCRIM No. 3160 on his list of proposed jury instructions. However, he argues that his trial counsel did not rely on this instruction during argument. Therefore, he claims the record fails to establish that his defense counsel requested the instruction based on a conscious, deliberate tactical choice. Furthermore, he insists it was not necessary for him to object below, since under section 1259 an appellate court may review any instruction given even if no objection was made below if the substantial rights of the defendant were affected.

We conclude it is not necessary for us to decide whether there was invited error. First, there *was* evidence to support the theory outlined in CALCRIM No. 3160. Torres seems to argue that the group beating exception is inapplicable because there were two separate assaults: first, the assault by Rivera when he punched Alvarado in the head, and second, the assault by Torres when he kicked Alvarado. Although witnesses were able to discern that Rivera first punched Alvarado and Torres later kicked him, the testimony

11

supports the prosecution's theory that both perpetrators attacked Alvarado as part of the same ongoing attack.[5] As described in *Modiri*, the group beating theory is applicable in cases where a defendant "joins [another] in actually beating and harming the victim." (*Modiri*, *supra*, 39 Cal.4th at p. 495.) Sequentially, Rivera punched Alvarado first, but witnesses asserted he was joined in the assault by Torres, who kicked Alvarado when he was on the ground.[6]

Additionally, even if the jury was able to determine that Torres kicked Alvarado or that Rivera punched him, this would still be a situation where the jury may be unable to ascertain which defendant caused Alvarado's injuries. Alvarado said he suffered from headaches and began hearing echoes as a result of the injuries to his head. Witnesses testified that both Torres' and Rivera's attacks--the punches and the kick--were directed toward Alvarado's head. Therefore, it may not have been clear to the jury which defendant caused the harm.

Furthermore, even if there was no evidence that the defendants attacked Alvarado at the same time, CALCRIM No. 3160 is a correct statement of law.[7] Although "[i]t is

---

[5] During closing argument, the prosecutor argued: "[Torres and Rivera] acted at the same time. Mr. Rivera and Mr. Torres, of course, assaulted [Alvarado] and great bodily injury occurred. Okay? So that's pretty obvious. They acted together."

[6] Sanchez testified that he could see from the bar that "[defendants] were hitting somebody." Guevara testified that she saw Rivera punching Alvarado. She went into the bar, and came back out and saw Torres kick Alvarado. She estimated only around 45 seconds lapsed between the two incidents. Lara testified that she saw Alvarado being beaten by Rivera, with Torres standing nearby. As she approached, she told the two defendants that they had called the police. She asserted that they stopped, but then Torres went back and kicked Alvarado in the head. Martinez testified that Rivera punched Alvarado, leaving him on the floor unconscious. Thereafter, Torres stepped in and kicked him in the head.

[7] Torres claims *Modiri* is controlling and holds that the group beating exception for the personal infliction requirement of section 12022.7, subdivision (a), applies only if there are two or more assailants who are acting at the same time. He also argues the exception is only applicable if, based on the evidence, the jury would be unable to (continued)

12

error to give an instruction which, while correctly stating a principle of law, has no application to the facts of the case" (*People v. Guiton* (1993) 4 Cal.4th 1116, 1129), "giving an irrelevant or inapplicable instruction is generally ' "only a technical error which does not constitute ground for reversal." ' " (*People v. Cross* (2008) 45 Cal.4th 58, 67.)

In this case, CALCRIM No. 3160 itself specifies that the jury can follow the instruction only if it is unable to determine which defendant caused which injury. The instruction also requires the jury to apply the exception only if "the People have proved that, one, two or more people acting at the same time assaulted" the victim. In summary, in order for the jury to apply CALCRIM No. 3160, the jury was instructed that it must first find these factual requirements true.

If the jurors did not find these factual requirements true, they would presumably have ignored CALCRIM No. 3160. Here, the trial court advised the jury pursuant to CALCRIM No. 200 as follows: "Some of these instructions may not apply depending upon your findings about the facts of the case. [¶] Do not assume just because I give a particular instruction that I'm suggesting anything about the facts. After you have decided what the facts are follow the instructions that do apply to the facts as you find them." There is nothing in the record that would undermine the presumption that the jury heeded this advisement and therefore ignored instructions that they found irrelevant. (*People v. Holloway* (2004) 33 Cal.4th 96, 152-153.) The court also instructed the jurors on the standard of proof beyond a reasonable doubt.

Nonetheless, Torres claims that an irrelevant inclusion of CALCRIM No. 3160 would have meant that the prosecutor only needed to prove that he "personally applied

---

determine which defendant caused which injury. This argument impliedly concedes that *Modiri* upheld the challenged instruction as a correct statement of law. (*Modiri*, *supra*, 39 Cal.4th at p. 493.)

force to the victim and that such force was sufficient to produce grievous bodily harm either alone or in concert with others," thereby lowering the People's required burden of proof. He argues any error in giving the instruction must therefore be evaluated under the *Chapman v. California* (1967) 386 U.S. 18, 24 standard (the harmless-beyond-a-reasonable-doubt test) for federal constitutional error.

We disagree. Instructional error is typically assessed under the *Watson* reasonable probability standard. (*People v. Jandres* (2014) 226 Cal.App.4th 340, 359.) Only those "[j]ury instructions that relieve 'the prosecution of the burden of proving beyond a reasonable doubt each element of the charged offense,' " violating a defendant's due process rights under the federal Constitution, must be assed under *Chapman*. (*Ibid*.)

The language of CALCRIM No. 3160, as we previously discussed, expressly limits its applicability to those situations where the jury is unable to determine which defendant caused which injury, and only if the People have proved that one or more defendants, acting at the same time, participated in the group beating. These factual predicates are laid out in the instruction itself and there is nothing to suggest the jury would have misunderstood these requirements. (*Mills*, *supra*, 1 Cal.App.4th at p. 918 [we must "assume that jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given"].) Accordingly, there is no reasonable likelihood that the inclusion of CALCRIM No. 3160 would have relieved the prosecution of its required burden of proof with respect to the enhancement.

Any error in giving CALCRIM No. 3160 is therefore subject to *Watson* review, and, for the reasons set forth above, we do not find a rational jury would have misapplied the instructions in the manner Torres complains of here.

14

c. **CALCRIM Nos. 370 and 1354**

Next, Torres and Rivera argue the court erred in instructing the jury with CALCRIM No. 370. Defendants claim that CALCRIM No. 370 is inconsistent when given in conjunction with CALCRIM No. 1354.

The trial court instructed the jury with CALCRIM No. 370 as follows:

"The People are not required to prove that the defendant had a motive to commit the crime charged in Count 1, assault with force likely to produce great bodily injury.

"In reaching your verdict you may, however, consider whether the defendant had a motive. Having a motive may be a factor tending to show that the defendant is guilty. Not having a motive may be a factor tending to show the defendant is not guilty.

"Let me read that again. I'm not sure I read that correctly.

"Having a motive may be a factor tending to show that the defendant is guilty. Not having a motive may be a factor tending to show the defendant is not guilty."

The trial court also instructed the jury with CALCRIM No. 1354 as follows:

"If you find the defendant guilty of the crime charged in Count 1, you must then decide whether the People have proven the additional allegation that the crime committed by the defendant was a hate crime. To prove this allegation the People must prove that the defendant committed that crime in whole or in part because of the alleged victim's actual or perceived sexual orientation, or association with a person or group having this actual or perceived characteristic.

"The defendant acted in whole or in part because of the actual or perceived characteristic of the victim if the defendant was biased against the victim based on the victim's actual or perceived sexual orientation or association with a person or group with this actual or perceived characteristic; and two, the bias motivation caused the defendant to commit the illegal acts."

15

Defendants argue that when these two instructions are given together, it is reasonably likely the jurors may have misunderstood and misapplied the law, finding that they committed a hate crime without proof of motive to commit the offense. The People claim this contention is forfeited, because Rivera's trial counsel requested clarification of CALCRIM No. 370, which the court agreed to modify. After the modification, which specified that CALCRIM No. 370 applied only as to count 1, assault with force likely to produce great bodily injury, none of the defendants objected.

"The long-standing general rule is that the failure to request clarification of an instruction that is otherwise a correct statement of law forfeits an appellate claim of error based upon the instruction given." (*People v. Rundle* (2008) 43 Cal.4th 76, 151, disapproved of on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) Here, Rivera objected to the use of CALCRIM No. 370, received a modification of the instruction, and did not make any further objections or request other clarifying instructions. Similarly, Torres did not object to the initial instruction or to the subsequent modification. Accordingly, we conclude that both defendants have forfeited this contention on appeal.

Furthermore, even if we were to consider the claim on its merits, we would find the court's instruction was not erroneous or prejudicial. "When we review challenges to a jury instruction as being incorrect or incomplete, we evaluate the instructions given as a whole, not in isolation. [Citation.] 'For ambiguous instructions, the test is whether there is a reasonable likelihood that the jury misunderstood and misapplied the instruction.' " (*People v. Rundle*, *supra*, 43 Cal.4th at p. 149.) The parties do not dispute that CALCRIM No. 370 is a correct statement of the law. After all, motive is *not* an element of the *crime* charged in this case, the assault (§ 245). However, motive is an element of the hate crime *enhancement*. An enhancement is not the same as a crime.

16

Defendants acknowledge the distinction between a crime and an enhancement, but contend this distinction was not clear based on the jury instructions and verdict forms. Therefore, they claim there was a reasonable likelihood that jurors misunderstood CALCRIM No. 370. We disagree.

First, the other instructions given to the jury clearly distinguish between a crime and an enhancement allegation. The court instructed the jury, "The defendants are charged in Count 1 with assault with force likely to produce great bodily injury in violation of Penal Code [s]ection 245[, subdivision] (a)(4). [¶] To prove that a defendant is guilty of *this crime . . . .*" (Italics added.) When giving CALCRIM No. 370, the court modified the instruction as follows, "The People are not required to prove that the defendant had a motive to commit *the crime charged in Count 1*, *assault with force likely to produce great bodily injury. . . .*" (Italics added.) It seems reasonably clear from the instructions that the jury was to apply the principles outlined in CALCRIM No. 370 only as to the crime charged in count 1, assault.

Defendants, however, claim the language of CALCRIM No. 1354 lends itself to ambiguity, because it initially differentiates between the underlying "crime" and the "additional allegation," but then includes the sentence that "[t]o prove this *allegation* the People must prove that the defendant committed *that crime* in whole or in part because of the alleged victim's actual or perceived sexual orientation . . . ." (Italics added.) We fail to see how the wording of the instruction is ambiguous or confusing. It plainly instructs the jury that to prove the additional *allegation* that the crime committed was a hate crime, the People must prove that the underlying crime was committed in whole or in part because of the victim's perceived or actual sexual orientation. The "crime" referenced in the latter sentence refers to the crime of assault.

Additionally, defendants argue the verdict forms used in the case fail to refer to the hate crime as an allegation or an enhancement. The verdict form used in the case

17

states, "WE, the Jury, further find that the said defendant . . . [did] commit the above offenses in whole or in part because of Aurelio Alvarado's sexual orientation in violation of Penal Code Section 422.75(a)." Although the verdict form does not specifically reference the hate crime allegation as an *allegation* instead of a crime, the characterization of the allegation was clearly set forth in the jury instructions. It is not reasonably likely, based on the instructions, that the jury misinterpreted the allegation.

Lastly, defendants claim that CALCRIM No. 370 uses the word "motive" while CALCRIM No. 1354 talks about "bias motivation," which they claim may cause confusion. However, since we "assume that jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given" (*Mills*, *supra*, 1 Cal.App.4th at p. 918), we conclude there is no harm. Read in context, CALCRIM No. 1354's reference to "bias motivation" is not inherently confusing. It seems readily apparent that the term "bias motivation" is meant to address a specific type of motivation: bias based on the victim's perceived or actual sexual orientation.

Therefore, we do not find it reasonably likely that the jury could have misapplied CALCRIM Nos. 370 or 1354.

2. *Probation Conditions*

Next, Rivera claims that two of his probation conditions are unconstitutionally vague. At sentencing, the court imposed the following conditions:

"You shall not annoy, molest, attack, strike, threaten, harass, stalk, assault, batter or disturb the peace of the victim or any witness in this case. You're to have no contact with any victim or any witness in this case, direct or indirect, or through a third person." Upon request by the People to include a "stay-out-of or stay-away" condition regarding the bar where the assault took place, the court added the following condition: "You're to stay out of Franco's Bar. If I put you 100-yards away from Franco's Bar that's about a third of the entire downtown of Castroville. So you're not to walk directly in front of

18

Franco's, you're not to be on that block." Rivera acknowledged he understood these conditions.

Preliminarily, we note the conditions imposed by the trial court during the sentencing hearing differ from those listed in the minute order, signed by the trial judge. The discrepancies are significant. For example, the signed minute order imposes a condition that defendant "[s]tay away at least 100 yards away from the victim, witnesses in this case, the victims and witnesses in this case of their residence or place of employment, and any vehicle the victim owns or operates." The trial court did not orally impose this specific condition during the sentencing hearing.

Rivera acknowledges the discrepancies between the orally imposed probation conditions and the conditions listed in the minute order. On appeal, he makes his arguments assuming the two sets of conditions can be harmonized but does not specify which conditions he believes should control.

"When an irreconcilable conflict exists between the transcripts of the court reporter and the court clerk, the modern rule is not automatic deference to the reporter's transcript, but rather adoption of the transcript due more credence under all the surrounding circumstances." (*People v. Rodriguez* (2013) 222 Cal.App.4th 578, 586.) Here, "there is no indication that the trial judge intended the signed minute order to modify or correct" its prior imposition of probation conditions during the sentencing hearing. (*Ibid.*) Therefore, we order the minute order to be corrected to reflect the conditions actually imposed by the trial court during the sentencing hearing. Having done so, we review the constitutionality of the probation conditions as imposed by the court during the sentencing hearing.

"A Court of Appeal may review the constitutionality of a probation condition, even when it has not been challenged in the trial court, if the question can be resolved as a matter of law without reference to the sentencing record." (*People v. Pirali* (2013) 217

19

Cal.App.4th 1341, 1345, citing *In re Sheena K*. (2007) 40 Cal.4th 875, 888-889 (*Sheena K.*).)

" 'Inherent in the very nature of probation is that probationers "do not enjoy 'the absolute liberty to which every citizen is entitled.' " [Citation.] Just as other punishments for criminal convictions curtail an offender's freedoms, a court granting probation may impose reasonable conditions that deprive the offender of some freedoms enjoyed by law-abiding citizens.' [Citation.] Nevertheless, probationers are not divested of all constitutional rights. 'A probation condition "must be sufficiently precise for the probationer to know what is required of him, and for the court to determine whether the condition has been violated," if it is to withstand a [constitutional] challenge on the ground of vagueness. . . .' (*Sheena K.*, *supra*, 40 Cal.4th at p. 890.)" (*People v. Barajas* (2011) 198 Cal.App.4th 748, 753.)

Rivera argues that the probation condition directing him not to have contact or association with the victim or witnesses in the case is unconstitutionally vague, because it lacks a knowledge requirement. The People concede, agreeing with Rivera that since these conditions do not list the name of the victim or witnesses, or list their addresses, describe their vehicles, or require Rivera's probation officer to provide this information, they are not constitutionally clear. We accept the People's concession on this point. Rivera could annoy or disturb the peace of a victim or witness with no awareness of having doing so. The same is true of the condition requiring him not to have "direct or indirect" contact with victims and witnesses in the case.

Accordingly, we modify the challenged condition to include an express knowledge requirement.

### DISPOSITION

The probation condition reading, "You shall not annoy, molest, attack, strike, threaten, harass, stalk, assault, batter, or disturb the peace of the victim or any witness in

20

this case. You're to have no direct contact with any victim or any witness in this case, direct or indirect, or through a third person," is modified to read, "You shall not knowingly annoy, molest, attack, strike, threaten, harass, stalk, assault, batter, or disturb the peace of the victim or any witness in this case. You are not to knowingly have direct contact with any victim or any witness in this case, direct or indirect, or through a third person." The trial court is also directed to correct the minute order dated November 1, 2013, so that it reflects the probation conditions actually imposed during the sentencing hearing. As modified, the judgment is affirmed.

_____
                                    Premo, J.

WE CONCUR:


_____
        Rushing, P. J.




_____
        Elia, J.




People v. Torres et al.
H040348